IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:21-CR-00042-2 |
| | § | HOUSTON, TEXAS |
| v | § | FRIDAY, |
| | § | JANUARY 24, 2025 |
| TITUS VAN HEUR | § | 1:00 P.M. TO 2:07 P.M. |

**ARRAIGNMENT AND DETENTION HEARING**

BEFORE THE HONORABLE PETER BRAY
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | JASON MARCHAND |
| COURTROOM ERO: | KAIDEN KIMBLE |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

**<u>APPEARANCES</u>:**

FOR THE UNITED STATES OF                US ATTORNEY'S OFFICE
AMERICA:                                Alexander L. Alum, Esq.
                                        1000 Louisiana Street
                                        Suite 2300
                                        Houston, TX 77002
                                        713-567-9000


FOR TITUS VAN HEUR:                     FLOOD & FLOOD
                                        Chris Flood, Esq.
                                        Stephen Dockery, Esq.
                                        914 Preston Street
                                        Suite 800
                                        Houston, TX 77002
                                        713-223-8877


ALSO PRESENT:                           Ramon Del Villar, Interpreter
                                        Sarita Gomez, Interpreter
                                        Christa Orphae, PTS

**<u>INDEX</u>**

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| KEVIN HOOL | | | | |
| By Mr. Alum | 11 | . | . | . |
| By Mr. Flood | . | 41 | . | . |

| EXHIBITS: | <u>Offered</u> | <u>Admitted</u> |
|---|---|---|
| <u>Government's:</u> | | |
| Exhibit 1 | 21 | . |
| Exhibits 2, 3, 4 | 21 | . |
| Exhibit 6 | 35 | 35 |
| Exhibit 8 | 12 | . |
| Exhibit 10 | 15 | . |
| Exhibit 23 | 30 | . |
| Exhibit 25 | 34 | . |
| Exhibit 28 | 31 | . |

**\*\*\***

1          **HOUSTON, TEXAS; FRIDAY, JANUARY 24, 2025; 1:00 P.M.**

2               COURT SECURITY OFFICER:  All rise.

3               THE COURT:  Good afternoon.  Be seated everyone.

4               Let's do the Arraignment -- the Arraignment for

5     Titus Van Heur.

6               UNIDENTIFIED SPEAKER:  Yes, Your Honor.  Good

7     afternoon.

8               THE COURT:  Good afternoon.

9               Who's here for the United States?

10              MR. ALUM:  Good afternoon, Your Honor.  Alex Alum.

11              THE COURT:  For the Defendant?  Come on up, sir.

12              MR. FLOOD:  Okay.

13              THE COURT:  Give me your appearance.

14              MR. FLOOD:  Sure.  Chris Flood on behalf of Titus

15    Van Heur, in addition to Stephen Dockery, Your Honor.

16              THE COURT:  All right.

17              MR. DOCKERY:  Thanks.

18              THE COURT:  Give me your full name, sir.

19              DEFENDANT VAN HEUR:  My full names are Titus Emil

20    Marie Van Heur.

21              THE COURT:  You've received a copy of the Indictment

22    that's been filed against you?

23              DEFENDANT VAN HEUR:  Yes, Your Honor.

24              THE COURT:  And by the -- when did he have his

25    initial appearance?

1          MR. FLOOD:  I didn't represent him, Your Honor.  It

2      was some time in the last week or 10 days ago.

3          UNIDENTIFIED SPEAKER:  It was December 31.

4          MR. FLOOD:  Oh.  Okay.

5          THE COURT:  Okay.  So you have -- do you have a copy

6      of this Indictment, sir?

7          DEFENDANT VAN HEUR:  Yes, Your Honor.

8          THE COURT:  Have you gone over it with your lawyer?

9          DEFENDANT VAN HEUR:  Yes, Your Honor.

10          THE COURT:  Your charged with conspiracy to commit

11      wire fraud and wire fraud.  Conspiracy is an agreement between

12      2 or more people to commit a crime where the object of the

13      agreement was -- is alleged to have been wire fraud which

14      means using internet or phones or other means like that to

15      obtain something to which you're not entitled.  And then the

16      other counts, 2 through 9, are what we refer to as the

17      substandard counts of wire fraud, so they're not the agreement

18      but the actual commission of fraud.

19          All of these counts carry up to 20 years in prison,

20      a $250,000 fine, 3 years of supervised release, and $100

21      special assessment.  Do you understand all that, sir?

22          DEFENDANT VAN HEUR:  I've read that.

23          THE COURT:  Do you understand what I just told you?

24          DEFENDANT VAN HEUR:  Yes.

25          THE COURT:  Do you waive formal reading?

1          MR. FLOOD:  We do, Your Honor.

2          THE COURT:  How does he plead?

3          MR. FLOOD:  He pleads not guilty, Your Honor.

4          THE COURT:  Not guilty plea is entered on the Record

5     for you.  Your cases have been assigned to Judge Ellison,

6     motions are due February 3, responses February 10, proposed

7     jury questions and jury charge are due January 31 -- that

8     can't be right.  I guess it is.  Do you think that's right?

9     If motions are due -- are the others set for trial, is that

10    what's going on?

11         MR. FLOOD:  There's another -- a co-defendant who's

12    been in custody much longer, Your Honor, in a separate trial.

13         THE COURT:  All right.  I'm just going to give you

14    the dates because he's got motions and responses due February

15    3 and 10.  Before that you're going to have your jury

16    questions and jury charge due, as well as pretrial conference

17    like literally next week, and then jury selection and trial

18    February 10.  You'll have to work on how that's going to work

19    out.

20         MR. FLOOD:  We'll ask for additional time, Your

21    Honor.

22         THE COURT:  All right.  We're also here -- okay, and

23    by the way, your unopposed motion to substitute counsel is

24    granted.

25         MR. FLOOD:  Thank you, Your Honor.

1         THE COURT:  So now we turn to the question of

2    detention.  When a person who has no otherwise legal status in

3    the United States, was extradited into the United States, what

4    is their immigration status?

5         MR. FLOOD:  You know, it's strange, Judge, he has no

6    status and so he'd be taken into Immigration custody upon

7    release here.  And we've tried -- well, we tried to get an

8    immigration bond for him so he --

9         THE COURT:  That's what I'm asking, is that even --

10   is that even possible?

11        MR. FLOOD:  Yeah.  Yeah, and I've actually been able

12   to do it in the past.

13        THE COURT:  On this -- in this instance?

14        MR. FLOOD:  Not with this Defendant obviously.

15        THE COURT:  No, no, no, no, no, in an extradition.

16        MR. FLOOD:  Yes, in an extradition -- oh, oh, where

17   the person was actually --

18        THE COURT:  It's different.

19        MR. FLOOD:   -- extradited?  I don't know that I

20   have, Your Honor.  You and I have some history with

21   extradition matters.

22        THE COURT:  I know, but it was the other way.

23        MR. FLOOD:  It was the other way.

24        THE COURT:  It would be the person who had complete

25   and --

1         MR. FLOOD:  I got it.

2         THE COURT:  -- utter legal status here --

3         MR. FLOOD:  Right.

4         THE COURT:  -- over different diplomatic concerns

5    and different set of legal rules entirely.

6         MR. FLOOD:  I understand.

7         THE COURT:  And here I just -- I just want to make

8    sure that this is not something -- I mean can I even entertain

9    this because -- do you know, do you know what the answer is?

10        MR. ALUM:  I don't know, Your Honor.  What I do know

11   is that there's an immigration -- there's an immigration

12   detainer lodged --

13        THE COURT:  Oh, I know that, but that's not

14   dispositive.

15        MR. ALUM:  Right.  Right.

16        THE COURT:  The question is whether -- like when you

17   bring somebody in on an extradition, and I'm getting --

18        MR. FLOOD:  Because it's involuntary at that point.

19        THE COURT:  -- the bond, but they're basically

20   being paroled into for the purpose of prosecution.

21        MR. FLOOD:  Right.

22        THE COURT:  It's almost like --

23        MR. FLOOD:  It's voluntary --

24        THE COURT:  -- a writ of habeas corpus *ad*

25   *prosequendum* if you're talking about state versus federal.

1          MR. FLOOD:  Right.

2          THE COURT:  It's the equivalent.  But here my

3     question is, has he even entered in the technical sense the

4     United States for immigration purposes such that he could be

5     given a bond from Immigration.  Is that even theoretically

6     possible?

7          MR. FLOOD:  Well, I mean how else would they be able

8     to put a detainer on him.  Right?  I mean the detainer must

9     claim that he's in the country with no status.  So he's in the

10    country for purposes of the --

11         THE COURT:  I mean that -- sometimes people file

12    pieces of paper that has nothing to do with the reality.

13         MR. FLOOD:  I'm with you 100 percent, Your Honor.  I

14    think --

15         THE COURT:  I think your answer is --

16         MR. FLOOD:  -- out of abundance of caution --

17         THE COURT:  -- because honestly you don't know.

18         MR. FLOOD:  Yeah, I honestly don't know --

19         THE COURT:  Then I'm just going to -- I'm just going

20    to assume that if I were to let him out on bail, then perhaps

21    he would get stuck in Immigration.

22         MR. FLOOD:  He would get stuck in Immigration, but

23    then we would be able to resolve --

24         THE COURT:  Indefinitely.

25         MR. FLOOD:  -- the immigration.  Well --

1          THE COURT:  This is -- the 5th Circuit just ruled on

2     this in the context of sort of more normal criminal

3     prosecution sans the extradition.  And they said that there --

4     if Immigration doesn't want to release him and doesn't want to

5     deport him, there's nothing that can be done about that.

6     There they sit.

7          MR. FLOOD:  Uh-huh.

8          THE COURT:  I just want to be clear that -- and I

9     don't know what the answer is, I need to hear some evidence,

10     but --

11          MR. FLOOD:  I don't think that's such a factor under

12     3142 for you to consider.

13          THE COURT:  I didn't say it was.

14          MR. FLOOD:  Oh, okay.

15          THE COURT:  I just want to be very clear that we all

16     know the potential for a -- his custodial status to be worse

17     than it is now.

18          MR. FLOOD:  Yeah, I hear you.

19          THE COURT:  Okay.  Then let's have the hearing.

20          MR. FLOOD:  Okay.

21          THE COURT:  Call your first witness.

22          MR. FLOOD:  Thank you, Your Honor.

23          MR. ALUM:  Your Honor, the Government calls FBI

24     Special Agent Kevin Hool.

25          THE CLERK:  Sir, face me, raise your hand.

1        (Witness sworn.)

2              THE CLERK:  Have a seat, sir.

3              MR. ALUM:  Judge, does the ELMO -- does the ELMO --

4              UNIDENTIFIED SPEAKER:  It works.

5              THE COURT:  Yeah, Jason just has to press the right

6    button.

7        (Pause in the proceedings.)

8                          DIRECT EXAMINATION

9    BY MR. ALUM:

10   Q    Good afternoon, sir.

11   A    Good afternoon.

12   Q    Would you please state and spell your name for the

13   Record?

14   A    Special Agent Kevin J. Hool.

15             THE COURT:  Spell it.

16             THE WITNESS:  K-E-V-I-N, last name is H-O-O-L.

17   BY MR. ALUM:

18   Q    And where do you work?

19   A    At the FBI.

20   Q    How long have you worked at the FBI?

21   A    Almost 16 years.

22   Q    And what is your role at the FBI?

23   A    I'm a special agent.

24   Q    How long have you been a -- I'm sorry, I just asked you

25   that.  What are your responsibilities as a special agent with

KEVIN HOOL - DIRECT BY MR. ALUM

1    the FBI?

2    A    I investigate violations of federal crimes -- federal

3    laws.

4    Q    Now, sir, in preparation for this hearing did you review

5    some of the evidence in this case?

6    A    Yes, I did.

7    Q    Are you the lead case agent?

8    A    No, I'm not.

9    Q    Is there evidence in the case that you haven't reviewed?

10   A    Yes, there is.

11   Q    And what sort of evidence did you review?

12   A    Email correspondence between the Defendants and co-

13   conspirators and victims, other electronic communication,

14   encrypted message, some financial records.

15   Q    Okay.  Now, Agent Hool, are you familiar with a Titus Van

16   Heur?

17   A    Yes, I am.

18   Q    And where -- do you know where he's a citizen of?

19   A    He's a citizen of the Netherlands.

20   Q    And do you know as of September 2023 where he was living?

21   A    The United Arab Emirates.

22   Q    Now, sir, I'm going to show you --

23          MR. ALUM:  I'm going to move to admit, I believe

24   without an objection, Government Exhibit 8.

25          (Government Exhibit No. 8 identified.)

1          MR. FLOOD:  No objection, Your Honor.

2          THE COURT:  Thank you.

3          MR. FLOOD:  And just for the Record, Your Honor, I

4     have looked at these exhibits before you took the Bench.

5          THE COURT:  All right.  That's fine.  I mean that me

6     considering them has no bearing on their ultimate

7     admissibility.  And just so you know, you can -- there's a

8     little dial there where you can zoom in --

9          MR. ALUM:  Oh.

10          THE COURT:   -- a little bit.  No, no, don't touch

11     the top thing.

12          MR. ALUM:  Sorry.

13          THE COURT:  Don't touch that.  Down further.

14          MR. ALUM:  Okay.

15          THE COURT:  Yeah, you've got to make right side up

16     for me.  Yeah, quit touching the top.

17          MR. ALUM:  Sorry.

18          THE COURT:  It'll mess it up.

19          UNIDENTIFIED SPEAKER:  That in --

20          MR. ALUM:  Okay.

21          UNIDENTIFIED SPEAKER:   -- like that.

22          THE COURT:  All right.

23          MR. ALUM:  All right.

24     BY MR. ALUM:

25     Q    Now, sir, I'm showing you Government Exhibit 8.  Do you

14

1    recognize that document, sir?

2    A    Yes, I do.

3    Q    And what is it?

4    A    It's a certificate of incorporation of a private limited

5    company.

6    Q    And what is -- what company does this certificate

7    certifying a corporation for?

8    A    Aurelius International Finance Limited.

9    Q    And I'm going to show you Page 4 of Government Exhibit 8.

10   Who's listed here, sir, as --

11         (Pause in the proceedings.)

12   BY MR. ALUM:

13   Q    Who's listed here, sir, as the company director?

14   A    Mr. Titus Van Heur.

15   Q    And what is the full name?

16   A    Mr. Titus Yute (phonetic) Emil Maria Van Heur.

17   Q    And where does it state -- say here, sir, that Mr. Van

18   Heur resides?

19   A    The United Arab Emirates.

20   Q    Do we have -- does the United States have an extradition

21   treaty with the United Arab Emirates?

22   A    No, the United States does not.

23   Q    Now did there come a point in time that the Defendant was

24   arrested in connection with the Indictment filed in this case?

25   A    Yes.

1    Q    Where was he arrested?

2    A    In Spain.

3    Q    And did the Defendant come to the United States

4    voluntarily to answer to the charges in the Indictment?

5    A    No, he did not.

6    Q    How did he arrive in the United States?

7    A    He was extradited.

8    Q    To your knowledge, sir, does the Defendant have any ties

9    to the Southern District of Texas?

10   A    Not to my knowledge, no.

11   Q    To your knowledge does have any ties to the United

12   States?

13   A    Not to my knowledge, no.

14   Q    Has the Defendant -- had the Defendant ever traveled to

15   the United States prior to be extradited?

16   A    Yes.

17   Q    And when was that --

18        MR. ALUM:  Well, I'm going to move into evidence

19   Government Exhibit 10 without -- I believe there's no

20   objection.

21        (Government Exhibit No. 10 identified.)

22        (Pause in the proceedings.)

23        MR. FLOOD:  I have no objection, Your Honor.

24        THE COURT:  All right.

25   BY MR. ALUM:

KEVIN HOOL - DIRECT BY MR. ALUM

16

1    Q    Sir, do you recognize Government Exhibit 10?

2    A    Yes, I do.

3    Q    What is it?

4    A    It's records of -- from US Customs and Border Protection

5    of entries and departures from the United States.

6    Q    And according to this record when was the -- and whose --

7    whose travel record is reflected on this document?

8    A    Titus Van Heur.

9    Q    And when was the last time that Mr. Van Heur traveled to

10   the United States?

11   A    September 2017.

12   Q    Now, sir, are you familiar -- based on your review of

13   documents in preparation for today's hearing are you familiar

14   with a Martien Eerhart?

15   A    Yes.

16   Q    And where is Mr. Eerhart a citizen of?

17   A    The Netherlands.

18   Q    Are you familiar with Marino Marrero?

19   A    Yes.

20   Q    And where is Mr. Marrero a citizen of?

21   A    The Dominican Republic.

22   Q    And who are Mr. Eerhart and Mr. Marrero?

23   A    Co-conspirators.

24   Q    Charged in the Indictment?

25   A    Charged in the Indictment, yes.

KEVIN HOOL - DIRECT BY MR. ALUM                                    17

1    Q    Okay.  Now let's talk about the scheme here.  At a high

2    level what is the Defendant and his co-conspirators -- what

3    are -- what are the Defendant and his co-conspirators alleged

4    to have done?

5    A    Generally they identified victims, received -- caused the

6    victims to put into escrow certain funds on the understanding

7    that they, the co-conspirators, would obtain documentation

8    showing the creditworthiness of the victim.

9    Q    Okay.  And just as a general matter has part of the

10   scheme how much would the victims pay?

11   A    It was different for different victims but generally it

12   was in the hundreds of thousands of dollars.

13   Q    And you mentioned that the victims paid this money in

14   exchange for what?

15   A    For documentation showing creditworthiness.

16   Q    And was some of this documentation stand-by letters of

17   credit?

18   A    Yes.

19   Q    And what is a stand-by letter of credit?

20   A    Stand-by -- it's a document from a financial institution

21   showing that a person or entity is eligible for financing.

22   Q    Okay.  And as part of the scheme how much financing were

23   these -- the victims -- how much financing were the victims

24   hoping to obtain in exchange for paying the money that you

25   just described they paid?

KEVIN HOOL - DIRECT BY MR. ALUM

1    A    Large amounts of money, sufficient for a business

2    investment, so hundreds of thousands or millions of dollars.

3    Q    Are you familiar with an entity Ming Global Trading?

4    A    Yes.

5    Q    And what is Ming Global Trading?

6    A    Ming Global Trading is the entity that the co-

7    conspirators used as the -- to obtain the documentation for

8    creditworthiness.

9    Q    What was -- do you know what was Ming Global Trading

10   represented to the victims to be, if anything?

11   A    An investment --

12   Q    Was Ming Global -- was Ming Global Trading purported to

13   have a relationship with particular banks?

14   A    Yes.

15   Q    And were these banks the ones that were represented to

16   the victims as those that could provide these letters of

17   credit?

18   A    Yes.

19   Q    And were the victims -- and for what purpose were the

20   victims seeking this credit --

21   A    There was --

22   Q     -- in the hundreds of thousands or millions of dollars

23   as you previously testified?

24   A    They were seeking credit in order to use it for business

25   investments.

KEVIN HOOL - DIRECT BY MR. ALUM

1    Q    Sir, what's an escrow agent?

2    A    An escrow agent is a person or entity that receives funds

3    and holds the funds until circumstances of a given agreement

4    are met.

5    Q    And the victims that were identified by the Defendant, by

6    Mr. Van Heur and his co-conspirators, to whom would they send

7    money -- the money?

8    A    They would provide the funds to an escrow agent.

9    Q    And what happened to the money after it was provided to

10    the -- after the victims provided it to the escrow agent?

11    A    Ultimately the money was disbursed from the escrow agent.

12    Q    To whom?

13    A    To the co-conspirators.

14    Q    Now earlier you were talking about these bank documents

15    that -- that would show that the victim purported had access

16    to financing.  Were these bank documents ever sent to the

17    victims?

18    A    Yes, they were.

19    Q    And what would generally happen as a general matter when

20    these letters were sent to the victims?

21    A    The victim would receive the letter, review the letter

22    and the letters were fraudulent.

23    Q    And you mentioned the letters were fraudulent.  Did the

24    victims ever confront Mr. Van Heur and his co-conspirators

25    regarding the fraudulent nature of the letter?

KEVIN HOOL - DIRECT BY MR. ALUM

1    A    At least some of the victims did, yes.

2    Q    And what would Mr. Van Heur and his co-conspirators'

3    response be?

4    A    They would respond with information -- information

5    obfuscating the objection or admonishing the victim for trying

6    to authenticate the information.

7    Q    Now you mentioned Mr. -- or Mr. Marrero and Mr. Eerhart

8    as co-conspirators of Mr. Van Heur.  Are there others?

9    A    Yes, there are.

10   Q    Who were not charged in the Indictment?

11   A    Yes, there are.

12   Q    Now let's talk about -- let's talk about Chris -- about

13   Chris Monet (phonetic).  Is Chris Monet referred to in the

14   Indictment as Victim A?

15   A    Yes, he is.

16   Q    Okay.  And who is Chris Monet?

17   A    Chris Monet is a victim who entered into an agreement

18   with the Defendant and the co-conspirators to provide a

19   certain amount of funding in the understanding that he would

20   be given authentication for receiving -- for creditworthiness.

21   Q    Authenticate -- authentication from where?

22   A    From a -- from a financial institution.

23   Q    Now, sir, I'm going to show you --

24        MR. ALUM:  I'm going to move to admit, without

25   objection from the defense, I think --

1          (Pause in the proceedings.)

2               MR. FLOOD:  I have no objection, Your Honor.

3               THE COURT:  All right.  It's admitted.

4          (Government Exhibit No. 1 received in evidence.)

5               MR. ALUM:  And I'll also, Your Honor, go ahead and

6     admit Government Exhibits 2, 3, and 4.

7          (Government Exhibit Nos. 2, 3 and 4 identified.)

8     BY MR. ALUM:

9     Q    Sir, I'm showing you Government Exhibit Number 1.  Do you

10    recognize this document?

11    A    Yes, I do.

12    Q    What is it?

13    A    This is the letter that the victim, Chris Monet,

14    received.

15    Q    Okay.  And specifically what kind -- well, let me ask

16    you, would you read the first paragraph, sir?

17    A    We hereby confirm to you with full bank responsibility

18    that our client, Ming Global Trading, Inc., has funds

19    available in the amount of GBP 22 million sterling, 22 million

20    GBP, and that we are ready, willing and able to issue a stand-

21    by letter of credit to be delivered, via hard copy delivered

22    bank-to-bank email and courier in the amount of GBP 22 million

23    sterling, 22 million GBP, on behalf of our client, Ming Global

24    Trading, Inc., to the benefit of Oak North Bank, Limited.

25    Q    Okay.  And Oak North Bank, Limited, do you know what that

KEVIN HOOL - DIRECT BY MR. ALUM

1    is?

2    A    That's a bank that Chris Monet was hoping to receive --

3    obtain financing from.

4    Q    Okay.  Now I'm going to show you, sir -- well, before I

5    do that, who is this letter addressed to?

6    A    To Mr. Adam Aegis (phonetic).

7    Q    And the email address that's in -- that he's an Oak North

8    Bank representative.  Is that right?

9    A    Yes.

10   Q    Okay.  And who signs the letter?

11   A    The letter is signed by Gene Bisnet (phonetic).

12   Q    Thank you.  Now I'm going to show you, sir, Government

13   Exhibit 2.  Right at the top here, sir, who's this -- the

14   email that's dated March 11, 2020 who's the email from?

15   A    From Chris Monet.

16   Q    And who is it sent to?

17   A    To Special Agent Jeff Weeks (phonetic).

18   Q    And who is Special Agent Jeff Weeks?

19   A    Special Agent Weeks is the primary case agent on this

20   investigation.

21   Q    And if we look at the very last email on this string, the

22   date is August 14, 2017.  Who is that from?

23   A    It's from Chris Monet.

24   Q    And who is it -- and to whom is it -- to whom is it sent?

25   A    To Diana Alos Mazuka (phonetic).

KEVIN HOOL - DIRECT BY MR. ALUM

23

1   Q    And Diana Alos Mazuka is whom?

2   A    Her signature block in the email identifies her as a

3   representative of Citibank.

4   Q    Sir, would you please read that email that Mr. Monet sent

5   to the Citibank representative out loud?

6   A    Thanks for taking my call today.  Attached is the letter

7   sent to Oak North Bank from Ming Global I mentioned.  1, I

8   called the number on the letter for several days, it is never

9   answered with no voicemail option; 2, I called Citi directory,

10  no Gene Bisnet listed as a Citi employee; 3, I called the Citi

11  International Finance Department, i.e. wire room, and S.W.

12  Jonathan, who said there was no such transaction reference

13  number in the system; 4, I'm unsure why a US bank, Citi New

14  York, would have British currency on deposit.  Again, trying

15  to confirm that this letter is valid.  Please let me know

16  ASAP.

17  Q    Now if we look at -- if we look at the bottom, this email

18  here dated August 16, 2017, who is it from?

19  A    From Diana Alos Mazuka.

20  Q    And she's a Citibank representative.  Correct?

21  A    Correct.

22  Q    And who is it to?

23  A    To Chris Monet.

24  Q    And would you please that email?

25  A    Hi, Chris, please be advised the document in question is

KEVIN HOOL - DIRECT BY MR. ALUM

1    more than likely counterfeit.  We do not have an employee by

2    the name of Gene Bisnet.  Feel free to reach out should you

3    need anything additional.  Thank you.

4    Q    Now what did Mr. Monet do when he received notification

5    from Citibank that the letter that was this letter, Government

6    Exhibit 1, that he received was a fraudulent letter?

7    A    He contacted the co-conspirators to confront them with

8    the allegation the letter was fraudulent.

9    Q    Now, sir, I'm going to show you Government Exhibit 3 --

10   Government Exhibit 3.  Do you recognize this document?

11   A    Yes, I do.

12   Q    What is it?

13   A    This is an email from Chris Monet to Special Agent Jeff

14   Weeks.

15   Q    And going to the second page of Government Exhibit 3 --

16   and to be clear, Jeff Weeks is the lead -- is the case agent

17   on this case?

18   A    Yes, that's correct.

19   Q    All right.  This email dated August 26, 2017, who is it

20   from?

21   A    From Titus Van Heur.

22   Q    And who is it sent to?

23   A    To Chris Monet.

24   Q    And who's copied on the email -- who else is copied on

25   the email?

1    A    Marty Eerhart.

2    Q    And would you please read that email, sir?

3    A    Dear Chris, we've been informed that you have made

4    unauthorized contact to various Citibankers in the US in

5    regards to the Citi RWA letter sent bank-to-bank to Oak North.

6    It seems you question the authenticity of this letter.  Our

7    investments funds are, as you know, held offshore in Costa

8    Rica and Dominican Republic with banks like, for example,

9    Citi.  We have no problem for you to speak to our Citibanker

10   in Costa Rica, Miguel Arsay (phonetic).  On Monday we will

11   reach out to him and ask him to call you Tuesday or Wednesday

12   so he can confirm to you things in regards to the issued RWA

13   letter.  Last but not least we would appreciate prudence and

14   openness to us.  Have a good weekend.

15   Q    Now going back to the first page -- first page of

16   Government Exhibit 3, the email dated August 27, who is that

17   from?

18   A    From Chris Monet.

19   Q    And who is that email sent to?

20   A    To Diana Alos Mazuka.

21   Q    And she's a Citibank representative.  Is that right?

22   A    Yes.

23   Q    And would you please read that email?

24   A    Diana, can you tell me if Miguel Arsay is employed with

25   Citibank?

1    Q    And the email date -- right on top of that dated August

2    30, 2017, who's it from?

3    A    From Diana Alos Mazuka.

4    Q    And to whom is it sent?

5    A    To Chris Monet.

6    Q    Would you please read that email.

7    A    GM Chris, we do not have a current employee with the

8    below name.  Thanks, Diana.

9    Q    After Mr. Monet learned that information from Ms. Diana,

10   the Citi employee, what did he do?  Mr. Monet.  Did he ever

11   confront the Defendant --  the Defendant and his co-

12   conspirators?

13   A    Yes, he did.

14   Q    Now I'm showing you, sir, Government Exhibit 4.  Do you

15   recognize what that document is?

16   A    It's another email sent from Chris Monet to Special Agent

17   Jeff Weeks.

18   Q    Okay.  And if we look to the bottom of Page 2 of

19   Government Exhibit 4, the email that is dated August 31, 2017,

20   who's that email from?

21   A    From Ming Global -- mingglobalt@gmail.com.

22   Q    And who -- whose name appears on the signature line of

23   that email?

24   A    Martien Eerhart.

25   Q    And is Mr. Van Heur copied on that email?

KEVIN HOOL - DIRECT BY MR. ALUM

1    A    Yes, he is.

2    Q    Would you please read that email out loud?

3    A    Dear Chris, we have been monitoring your attempts to

4    recover your funds after you declined the transaction with Oak

5    North.  It appears you have been contacting departments who

6    have not been involved in the transaction or are unaware of

7    the structure of the transaction.  Needless to say that banks

8    do not make transactions of this size public.

9         We understand your frustration but the document is

10   genuine regardless of what uninvolved parties state.  For

11   example -- for example imagine I have a Ford Escort in

12   Attleboro, Massachusetts that I want to sell to you.  Next you

13   call Ford in Boston, Massachusetts and ask them about my

14   Escort.  They have no idea what you're talking about.  Next

15   you call Ford HQ and they have no clue when you ask them about

16   my Escort.  You can exchange the Escort to any other car type.

17   The same process happens in banks.

18   Q    And would you then, please, the email on the top of that

19   page, what date was it sent on August 31, 2017, who's that

20   email from?

21   A    From Chris Monet.

22   Q    To whom?

23   A    To mingglobalt@gmail.com.

24   Q    And is Mr. Van Heur copied on that email?

25   A    Yes, he is.

KEVIN HOOL - DIRECT BY MR. ALUM

1    Q    Would you please read that email out loud?

2    A    Marty, your analogy is inaccurate, however, I'm told by

3    other parties involved you're arranging to return the 35,000

4    to CPI's account.  I look forward to receiving this ASAP.

5    Q    Now, Agent Hool, did -- forgive me that I can't remember

6    if you -- if you testified to this, but how much money had Mr.

7    Monet paid the escrow agent?

8    A    Over $200,000.

9    Q    And where he -- in this -- in the email that you just

10   read from Government Exhibit 4 why is he demanding only 35,000

11   back from Marty Eerhart?

12   A    Before that email he had already received the remaining

13   funds returned to him from the escrow agent.

14   Q    From whom?  I'm sorry, from whom?

15   A    From the escrow agent.

16   Q    And did he receive -- and the remaining $35,000 that he

17   demanded from Mr. Eerhart, did he get that money back?

18   A    Yes, he did.

19   Q    So was Mr. Monet refunded the entirety of his payment?

20   A    Yes, he was.

21   Q    Now was Mr. Monet the only intended victim in this case?

22   A    No, he was not.

23   Q    The Indictment refers to Victims B, C and D.  Is that

24   right?

25   A    Yes.

1    Q    And now I want to show you, sir --

2                THE COURT:  Can I just say that I -- I mean I think

3    I understand how the fraud is alleged to have happened.

4                MR. ALUM:  Okay.

5                THE COURT:  I mean we --

6                MR. ALUM:  Do you --

7                THE COURT:  -- don't have to go through every

8    transaction in my opinion.  Does anybody think we need to go

9    through every transaction?

10               MR. FLOOD:  I agree with Your Honor that --

11               THE COURT:  So this was like --

12               MR. FLOOD:  -- it doesn't really go to the issues

13   that you're considering anyway.

14               MR. ALUM:  Also the weight of the evidence, but I --

15               THE COURT:  Really I'm trying to tell you --

16               MR. ALUM:  Yeah.

17               THE COURT:  -- I understand you have evidence to

18   support the charge is how it sounds to me --

19               MR. ALUM:  Okay.

20               THE COURT:  -- without, you know, finding --

21               MR. FLOOD:  Yeah, I mean I asked some questions.

22               THE COURT:  Yeah, yeah, that's fine, but just --

23               MR. ALUM:  I'll move --

24               THE COURT:  -- behind the scenes Rome is burning.

25   Okay.

KEVIN HOOL - DIRECT BY MR. ALUM

1          MR. ALUM:  I understand.

2          THE COURT:  All right.

3     BY MR. ALUM:

4     Q    Sir, was money from the victims ever transferred to an

5     entity named Trionus (phonetic) Investments?

6     A    Yes.

7     Q    And I'm showing you -- I'm showing you Government

8     Exhibit 23.

9          (Government Exhibit No. 23 identified.)

10    BY MR. ALUM:

11    Q    Do you know what that is, sir?

12    A    Yes, I do.

13    Q    What is it?

14    A    It's a certificate of incorporation of a private limited

15    company.

16    Q    And what's the name of that company?

17    A    Trionus Advisory, Ltd.

18    Q    And the company director is whom?

19    A    Titus Ven Heur.

20    Q    And I'm just going to show you, sir, Government

21    Exhibit -- quickly show you --

22         (Pause in the proceedings.)

23          MR. FLOOD:  Your Honor, I have no objection to -- I

24    guess it has flow charts with the things alleged in the

25    Indictment.  I'm told that 1 is not alleged in the

1      Indictment --

2              MR. ALUM:  Not specifically alleged.  It's part of -

3      - it's moving parts.

4              MR. FLOOD:  Is it mentioned in the Indictment?

5              MR. ALUM:  Not explicitly.

6              MR. FLOOD:  Okay.  Then we object to that one, Your

7      Honor.

8              THE COURT:  I'm allowed to consider the conduct,

9      whether it's alleged in the Indictment or not.  That's

10     overruled.

11     BY MR. ALUM:

12     Q    All right.  And just real quickly here, sir, Jacob --

13     Government Exhibit 28, Jacob Anderson, is he one of the

14     victims?

15     A    Yes.

16          (Government Exhibit No. 28 identified.)

17     BY MR. ALUM:

18     Q    Okay.  And Trionus Investment, is that the Defendant's

19     company?

20     A    Yes.

21     Q    And here they received 250,000 -- $215,000?

22     A    Yes.

23     Q    And Max Barber, is he another one of the victims?

24     A    Yes.

25     Q    And Trionus Investments, Defendant's company, did they

1    receive $300,000?

2    A    Yes.

3    Q    And Gregory Thomas, is he one of the victims?

4    A    Yes.

5    Q    And Trionus Investments, did they receive $100,000?

6    A    Yes.

7    Q    And Evan Kaygen (phonetic) is he one of the victims?

8    A    Yes.

9    Q    And ING Bank, was that a bank account that the Defendant

10   had?

11   A    Yes.

12   Q    And did he receive $300,000?

13   A    Yes.

14   Q    And, sir, aside from -- aside from ING Bank does the

15   Defendant -- how many accounts does the Defendant have with

16   ING Bank, sir?

17   A    At least 4.

18   Q    And is that a foreign bank account?

19   A    At least some of them are, yes.

20   Q    And BNP Paribas, does the Defendant have an account with

21   that bank?

22   A    Yes.

23   Q    And did some of the money flow into that account --

24   A    Yes.

25   Q     -- from the victims?

1     A     Yes.

2     Q     And is that -- is BNP Paribas a foreign bank account?

3     A     Yes.

4     Q     For the -- for Mr. Van Heur.  Now after the return of the

5     Indictment, sir, did Mr. Van Heur participate in another --

6     did Mr. Van Heur fraudulent activity continue?

7     A     Yes, it did.

8               MR. ALUM:  This is that.

9               MR. FLOOD:  Yeah, Judge, I renew my objection,

10    there's no evidence that Mr. Van Heur was aware of the

11    Indictment or anything, so the implication that he continued

12    his conduct even after the Indictment was returned --

13              THE COURT:  You can make arguments later.  It's just

14    it's evidence of that is admissible under 3142(g).

15              MR. FLOOD:  Okay.  Okay.

16              THE COURT:  It has to do with his conduct.  I mean

17    it's like telling me that I can't consider, you know, somebody

18    who robbed 5 more banks after the first one that's indicted.

19    I mean I can totally consider it.

20              MR. FLOOD:  I understand, Your Honor.  The

21    implication that he --

22              THE COURT:  Well, you can clear up the implication.

23              MR. FLOOD:  Okay.

24              THE COURT:  I got it.

25              MR. FLOOD:  All right.

KEVIN HOOL - DIRECT BY MR. ALUM

1            THE COURT:  I mean I was literally just thinking of
2      what you're thinking.  I mean I do this for a living.  I got
3      it.
4            MR. FLOOD:  I understand, Your Honor.
5            THE COURT:  Okay.
6            MR. ALUM:  I'm moving to admit Government
7      Exhibit 25.
8         (Government Exhibit No. 25 identified.)
9      BY MR. ALUM:
10     Q    Mr. -- or Agent -- Agent Hool, did this -- well, what are
11     we looking at here, sir?
12     A    This is another flow chart showing the movement of funds
13     from a victim, GenLux (phonetic), through an escrow agent.
14     Q    And this victim, Mr. Kenneth Brown, was this somewhere
15     late 2021, early 2022?
16     A    Yes.
17     Q    And Aurelius Consulting, is that -- whose company is
18     that?
19     A    That is Mr. Titus Van Heur.
20     Q    And he received $235,000 from that scheme?
21     A    Yes.
22     Q    And did the scheme work in a similar way as you have
23     generally described throughout the course of your testimony?
24     A    Yes.
25     Q    And as part of this scheme, sir, the scheme depicted in

1    this flow chart, was the victim -- was the victim under the

2    impression that he would receive a letter of credit from BNP

3    Paribas?

4    A    Yes.

5    Q    And did he receive documentation from BNP Paribas?

6    A    Yes, he did.  He received documentation.

7    Q    Okay.  And that documentation, was it legitimate?

8    A    It was not.

9    Q    And did the victim -- did the victim send this

10   documentation to Mr. Eerhart?

11   A    He or his representative confronted the co-conspirators

12   about the alleged fraudulent nature of the documentation.

13   Q    Okay.

14            MR. ALUM:  And I'm going to move into --

15            MR. FLOOD:  I have no objection, Your Honor.

16            MR. ALUM:   -- moving into evidence Government

17   Exhibit 6.

18            THE COURT:  It's admitted.

19       (Government Exhibit No. 6 identified and received in

20   evidence.)

21            MR. ALUM:  This is the last exhibit, Judge.

22   BY MR. ALUM:

23   Q    The bottom email, sir, who is that -- who is that from?

24   A    From Robert Patrick.

25   Q    And who's Robert Patrick?

KEVIN HOOL - DIRECT BY MR. ALUM

1   A    Robert Patrick is a consultant that was working with the
2   victim to authenticate the documentation.
3   Q    With BNP Paribas?
4   A    With BNP Paribas, correct.
5   Q    Okay.  And just -- can you just read the first -- that
6   sentence -- the first sentence of that email?
7   A    Attached please find the demand letter on behalf of our
8   client, GenLux, LLC, for the immediate return of the funds
9   that were invested in a fraudulent transaction.
10  Q    And GenLux was that the victim's company --
11  A    Yes.
12  Q     -- for which he was seeking a letter of credit from BNP
13  Paribas?
14  A    Yes.
15  Q    Okay.  And finally that top email dated January 19, 2022,
16  who's it from?
17  A    From Martien Eerhart.
18  Q    And who is it sent to?
19  A    To Robert Patrick.
20  Q    And is Mr. Van Heur copied on that email?
21  A    Yes.
22  Q    Okay.  And just please read that email out loud.
23  A    Bob, I received your email.  The document named BNP
24  Paribas response to confirmation 1/4/22 came from BNP UK, not
25  BNP France from where the instrument was issued from.  They

1    might be neighboring countries, but are still separately run.

2    Whoever contacted BNP UK is or was not a client or main

3    account holder at BNP France.

4    Banks cannot provide financial privacy information

5    to third parties.  And so the banks is that when unauthorized

6    or unexpected inquiries or probes are made on accounts to

7    automatically deny them.  It is a standard procedure that most

8    larger banks follow to protect their clients.

9    Imagine if I were to contact your bank or send an

10    email concerning your account, what would be the most likely

11    outcome.  Most likely they would not disclose the information

12    to me.  Or if I were to email your bank about a wire transfer

13    you did not -- you did to another party and I start to ask

14    questions about your wire transfer, I'm not sure what the

15    reply would be, but it would not be very insightful.

16    Kenny has a contract with CNS at KEV, why is he not

17    approaching his counterparty at KEV?  Kenny is the

18    counterparty, how come Bob --

19    Q    I think you can stop.

20    A    -- is sending an email --

21    Q    Thank you, sir.  Thank you.

22    (Pause in the proceedings.)

23    MR. ALUM:  Your Honor, I have no further questions.

24    THE COURT:  Cross.  And actually, before you go, let

25    me just -- let me ask a question or 2 --

1              MR. ALUM:  Yeah.  Yeah.

2              THE COURT:  -- so that we don't have to --

3              MR. ALUM:  Sure.

4              THE COURT:  -- do it twice.

5         When you said he was living in the UAE, when was he

6    living in the UAE?

7              THE WITNESS:  That was from a document that he

8    showed in articles of -- the articles of incorporation.

9              THE COURT:  Do you have evidence other than that

10   that he was living in the UAE?

11             THE WITNESS:  The FBI does, yes, Your Honor.

12             THE COURT:  Okay.  When was he living in the UAE?

13             THE WITNESS:  I don't know that, Your Honor.

14             THE COURT:  What's the date of the document again?

15             THE WITNESS:  2023, as of 2023.

16             THE COURT:  2023?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  And then do you know why he went to

19   Spain?

20             THE WITNESS:  No, I do not, Your Honor.

21             THE COURT:  And so was he encountered in Spain

22   pursuant to this warrant, or for some other reason?

23             THE WITNESS:  He was arrested in Spain pursuant to

24   this warrant, Your Honor.

25             THE COURT:  This warrant.  And then the Government

1    initiated extradition proceedings.  Right?

2             THE WITNESS:  Yes, Your Honor.

3             THE COURT:  And he's been -- he was in custody in

4    Spain since then, since like let's say 10 months or so.  Is

5    that right?

6             THE WITNESS:  Yes, Your Honor.

7             THE COURT:  Another clarification is where did you

8    get the information that his last travel to the United States

9    was 2017?  And I'll -- the reason I ask that is because the

10   pretrial report says he reported it to be 2007.  And I just

11   want to see -- I want to know if that's a typo or what.

12            THE WITNESS:  I can find out, Your Honor.

13            MR. ALUM:  Your Honor, that was -- that was a --

14   there was a -- the DHS records corroborate that he traveled to

15   the US in 2017.  That was an exhibit --

16            THE COURT:  Okay.  So we've got the DHS records that

17   say 2017.  Okay.  And who -- I'm going to need somebody from

18   Pretrial to tell me whether they made a typo or not --

19            MS. ORPHAE:  Your Honor --

20            THE COURT:   -- whoever wrote this --

21            MS. ORPHAE:   -- I kept the notes and we have over

22   10 years ago in 2007 till -- does not -- she hasn't been able

23   to (indiscernible), Your Honor.

24            THE COURT:  I want whoever wrote this report to come

25   here and tell me that he said the words 2007.

1               MS. ORPHAE:  Yes, Your Honor, I will.

2               MR. FLOOD:  Your Honor, I can tell you that --

3               THE COURT:  I want to know -- I just want to know

4       what he said.  Were you there?

5               MR. FLOOD:  Yeah, it -- no, no, I wasn't there.

6               THE COURT:  All right.

7               MR. FLOOD:  I didn't represent him --

8               THE COURT:  So you're not a witness.

9               MR. FLOOD:  No, but I've spoken to him about it,

10      Your Honor.  I can tell you that it's actually later than

11      2017.

12              THE COURT:  Okay.  And I want to know why he said

13      2007 to Pretrial is what I'm asking.  That's why we're going

14      to get a Pretrial Services --

15              MR. FLOOD:  Right.

16              THE COURT:   -- officer here --

17              MR. FLOOD:  I understand.

18              THE COURT:   -- who's going to tell me what he told

19      them.

20              MR. FLOOD:  Okay.

21              THE COURT:  Because it also doesn't say anything

22      about the UAE in here.

23              MR. FLOOD:  It's because he doesn't reside in the

24      UAE and has not resided in the UAE.

25              UNIDENTIFIED SPEAKER:  Right.

1          THE COURT:  Well, go ahead, cross the -- cross the

2     witness, see what --

3          MR. FLOOD:  Well, in that regard I guess I'll follow

4     up.

5                          CROSS-EXAMINATION

6     BY MR. FLOOD:

7     Q    But the -- what -- you provided us with evidence that he

8     lived in the UAE as where a service address was.  Correct?

9     For a particular company?

10    A    It -- correct, it's the address that he provided on

11    articles of incorporation.

12    Q    Right, for service of process for a corporation.

13    A    Correct.

14    Q    Right.  You have done the investigation and found that he

15    actually lives in the Netherlands.  Correct?

16    A    The prior case agent would know -- would know that

17    information.

18    Q    Okay.  All right.  So your basing the UAE testimony on

19    this certificate of incorporation with a date of service.

20    Correct?

21    A    Yes.

22    Q    Place of service.  Correct?

23    A    Okay.

24          MR. FLOOD:  Your Honor, I want to address the last

25    time he was in the US issue that you brought up, because I

KEVIN HOOL - CROSS BY MR. FLOOD

1    think we can get to the end -- the bottom of that later.  But

2    with regard to his other testimony I just have a couple of --

3    I'll try to go through this as quickly as I can.

4    BY MR. FLOOD:

5    Q    So there -- on your direct testimony you testified about

6    a transaction involving a Mr. Monet.  Do you recall that?

7    A    Yes.

8    Q    All right.  And that was a situation where there was an

9    escrow agreement signed between Mr. Monet and I think Mr.

10   Green.  Is that right?

11   A    I don't recall the -- who the escrow agreement was with,

12   but there was an escrow agreement involving Mr. Monet.

13   Q    And isn't it true there's an escrow agreement in each of

14   these transactions?

15   A    Yes.

16   Q    And that escrow agreement requires that the individual

17   that you've identified as the victim needs to send money to an

18   escrow agent.  Correct?

19   A    Yes.

20   Q    And then that --

21        MR. FLOOD:  (Clears throat.)  Excuse me, Your Honor.

22   BY MR. FLOOD:

23   Q    That escrow agent then disburses the money in accordance

24   with the escrow agreement.  Correct?

25   A    Correct.

KEVIN HOOL - CROSS BY MR. FLOOD

1    Q    And the victim that you've identified has approached Mr.

2    Eerhart or somebody else, Mr. Green oftentimes, in an attempt

3    to get collateral for financing, not financing itself.

4    Correct?

5    A    That -- I don't -- I don't know the particulars of the

6    agreements, but the victims provided funds in the

7    understanding that they would receive a letter --

8    Q    A stand-by --

9    A     -- of credit.

10   Q     -- letter of credit.

11   A    Yes, correct.

12   Q    Right.  Which would then be used as collateral to get

13   loans from a bank.  Correct?

14   A    Yes.

15   Q    All right.  So it's not a situation where Ming Global,

16   Mr. Eerhart, Mr. Marrero, whatever represented themselves as

17   banks that can lend money to the person.  Right?

18   A    Yeah.

19   Q    It was, We will make our best efforts to get you a stand-

20   by letter of credit that you can then use to go get money from

21   whatever financial institution you want to get.

22   A    Yes.

23   Q    Right.  And in these transactions that are alleged in the

24   Indictment, and, in fact, the one not alleged in the

25   Indictment it's a situation where Mr. Eerhart or someone else,

KEVIN HOOL - CROSS BY MR. FLOOD

1   not Mr. Van Heur, approached -- or was approached by the

2   alleged victim to get this collateral.  Right?

3   A    Yes.

4   Q    And in the escrow agreements isn't it detailed that if

5   certain things are done by Ming Global or Mr. Eerhart then

6   funds will be disbursed?

7   A    Yes.

8   Q    Okay.  So the escrow agent then disburses funds in

9   accordance with the escrow agreement.

10  A    Yes.

11  Q    Right.  And there's never a guarantee, Hey, we're going

12  to be able to get this stand-by letter of credit, just that

13  We'll make best efforts.  Right?

14  A    That would be the representation made, yes.

15  Q    All right.  And in the one instance where you testified

16  that Mr. Van Heur actually was involved and was notified that

17  something might have been fraudulent, that was Mr. Monet's

18  case.  Correct?

19  A    Correct.

20  Q    And in that case after Mr. Van Heur is informed that, in

21  fact, this Citibank letter may not be accurate, the money was

22  refunded.

23  A    Yeah.

24  Q    Isn't that right?

25  A    Yes.

1    Q    He didn't lose any money at all.

2    A    No.

3    Q    All right.

4            THE COURT:  At this time now what's the total amount

5    of loss to the victims that you know about?

6            THE WITNESS:  Off the top of my head over a million

7    dollars.

8    BY MR. FLOOD:

9    Q    And that's money paid by people pursuant to an escrow

10   agreement with someone not Mr. Van Heur.  Correct?

11   A    An escrow agreement, I don't know the terms of any

12   specific escrow agreement.

13   Q    Well, you reviewed the escrow agreements prior to

14   testifying today.  Correct?

15   A    Yes.

16   Q    And none of them are between the alleged victim and Mr.

17   Van Heur.  Correct?

18   A    They were between business entities, Ming Global is the

19   primary that I've seen on most of the agreements.

20   Q    Ming Global is the escrow agent?

21   A    No.

22   Q    Okay.

23   A    No, not the escrow agent, no.

24   Q    Ming Global was a company run by Mr. Eerhart that

25   contracted with the individuals.  Correct?

1    A    Yes.

2    Q    To try to get these letters of credit.

3    A    Yes.

4    Q    And then there's an escrow agent hired by the parties

5    that money by the alleged victim was put into the escrow

6    account and then disbursed by the escrow agent, not Mr. Van

7    Heur.

8    A    No, that's correct.

9    Q    All right.  And you don't know of any communications

10   between Mr. Van Heur and any of the alleged victims where Mr.

11   Van Heur made a fraudulent representation.  Correct?

12   A    I wasn't sure I understand your question.  You said --

13   Q    Let me make it a little more clearer and I'll try to make

14   this quicker.  We saw in your direct testimony a situation

15   where Mr. Van Heur actually was involved in the process and

16   was alerted that this Citibank letter may not be accurate, may

17   not be real.  Remember that?

18   A    Yes.

19   Q    And in that instance the money was returned to the

20   alleged victim.  Right?

21   A    Yes.

22   Q    Do you -- you don't know of any other communications by

23   Mr. Van Heur to any of these alleged victims where he is

24   making a false representation.

25            THE COURT:  I think he means directly.

1          MR. FLOOD:  Directly.

2          THE WITNESS:  Directly --

3          THE COURT:  Directly.

4          THE WITNESS:   -- directly --

5          MR. FLOOD:  Right.

6          THE WITNESS:   -- not that -- not that I'm aware of.

7          MR. FLOOD:  Okay.

8      (Pause in the proceedings.)

9          MR. FLOOD:  I don't think I have any further

10 questions, Your Honor.  Thank you.

11          THE COURT:  Stay put, I just want to be where you --

12 because this has got to do with it.  So wrote this pretrial

13 report?  Just we're going to kind of do this out of order and

14 quicker.

15          MS. ORPHAE:  Actually, Your Honor, it's Christa

16 Orphae with Pretrial.

17          MS. ORPHAE:  All right.  Do you solemnly swear to

18 tell the truth, the whole truth and nothing but the truth, so

19 help you God?

20          MS. ORPHAE:  Yes.  Yes, sir.

21          THE COURT:  Did he say 2007 was his last travel to

22 the United States?

23          MS. ORPHAE:  So, Your Honor, again, my notes do say

24 2007, but I also wrote down that he said it was over 2 years

25 ago, but then he also said it was to New York in 2007.  So I

KEVIN HOOL - CROSS BY MR. FLOOD

1    don't know if his math is just off, but he said over 2 years

2    ago, then said --

3              THE COURT:  All right.

4              MS. ORPHAE:   -- New York in 2007.

5              THE COURT:  So it's just unclear.

6              MS. ORPHAE:  Yes, Your Honor.

7              THE COURT:  Got it.  Fair enough.  All right.

8              MR. FLOOD:  And just so the Court's aware, he

9    traveled to San Antonio just before the pandemic, so I don't

10   know -- I don't think that was --

11             THE COURT:  All right.

12             MR. FLOOD:   -- 10 years ago, so.

13             THE COURT:  Okay.  I don't -- I think I just don't

14   know.  So, all right, that doesn't provoke any questions for

15   him, does it?

16             MR. FLOOD:  No, it doesn't, Your Honor.

17             THE COURT:  All right.  You can --

18             MR. FLOOD:  I don't have anything further for the

19   agent.

20             THE COURT:  Do you have anything else for him?

21             MR. ALUM:  No, Your Honor.

22             THE COURT:  All right.  You can step down.

23        (Witness steps down.)

24             THE COURT:  Do you have any other evidence or

25   witnesses?

1          MR. ALUM:  No, Your Honor.

2          THE COURT:  And do you have evidence, witnesses or

3    proffer?

4          MR. FLOOD:  We have a proffer, Your Honor.

5          THE COURT:  Go ahead.

6          MR. FLOOD:  If I -- if I can allow Mr. Dockery with

7    my office to make the proffer.

8          THE COURT:  That's fine, whoever wants to do it,

9    just say your name and then do it.

10          MR. DOCKERY:  Yes, Your Honor.  Stephen Dockery with

11    Flood & Flood.  The proffer would be that Mr. Van Heur would

12    take whatever steps necessary to ensure the Court about his

13    appearance.  He's invested heavily in his defense, he takes

14    these charges very seriously.  Due to the other co-defendants'

15    time line in this case he's going to be expected to get up to

16    speed very quickly with the discovery, review of material.

17    He's currently being held in Joe Corley which makes visits and

18    discovery review difficult.

19          He's already involved in -- and his wife has been

20    involved trying to find apartments near the courthouse and our

21    office to make court appearances and attorney visits easy.

22    His wife and family members -- or his wife would be able to

23    come live with him and be a co-surety or co-signer on whatever

24    conditions are --

25          THE COURT:  Where's the wife live?

1          MR. DOCKERY:  In The Netherlands.

2          THE COURT:  Okay.

3          MR. DOCKERY:  And the other thing --

4          THE COURT:  Does she -- does she have a visa or

5     otherwise status to come to the United States?

6          MR. DOCKERY:  I believe Dutch citizens could get

7     a -- she could get a visitor's visa --

8          THE COURT:  Okay.

9          MR. DOCKERY:   -- almost immediately.  The Consulate

10    General of the Netherlands has reached out to our office to

11    ensure that Mr. Van Heur is treated fairly and even resources

12    are available to him.  He has no criminal history and would be

13    totally fine with any type of conditions, GPS monitoring,

14    frequent check ups, whatever is necessary for the Court.

15         THE COURT:  Thank you.

16         MR. DOCKERY:  Thank you, Your Honor.

17         THE COURT:  Argument?

18         MR. ALUM:  Your Honor, the Government is moving for

19    detention.  As I know that the Court is aware, there is

20    presently an ICE detainer.  Defendant has no legal status in

21    this country.  He did not appear to answer to the charges

22    voluntarily but was extradited.  He is facing up to 20 years

23    as to each of the counts that he faces -- that he -- that --

24    alleged in the Indictment.

25         THE COURT:  What is really the guideline range

1    though?

2                   MR. ALUM:  Your Honor, the guideline range, I

3    believe it is 46 to 57.

4                   THE COURT:  Is that with acceptance or without?

5                   MR. ALUM:  That's -- if the Court would just bear

6    with me one moment.  A conservative guideline calculation with

7    his total offense level of 23, 46 to 57 months.  That's

8    without acceptance, but with the zero point -- the 4C1.1.

9                   THE COURT:  Okay.  All right.  What else?

10                  MR. ALUM:  He has multiple foreign bank accounts, he

11   has access to -- evidently access to large amounts of money.

12   The Court anticipated an argument that I was going to make in

13   that there is -- there is a discrepancy between the date that

14   we can verify he last traveled to the United States and what

15   he told Probation.  He also told Probation he lived in the

16   Netherlands, we have a certificate of incorporation that shows

17   that his residence -- or --

18                  THE COURT:  I just -- I just want to tell you one

19   thing that -- because I don't want to belabor this, the

20   sausage making process during pretrial interviews is not

21   nearly what you think it is.  I accept that there's probably

22   just a miscommunication about that.

23                  MR. ALUM:  That's -- that's --

24                  THE COURT:  It just is what it is.  I can't tell --

25                  MR. ALUM:  Fair enough.

52

1          THE COURT:  Yeah.

2          MR. ALUM:  Fair enough, Judge, on that, and again --

3          THE COURT:  I just don't want the Record to be -- to

4     be muddy or have it be that, you know, somehow or another I'm

5     relying on some date.  It just -- it's not a big -- it's a not

6     big deal.  And I don't know that the UAE thing is not just a

7     lie.  I don't know that we know that he was living there.  It

8     just -- he's either living in the UAE or he's lying about

9     living in the UAE.  Right?

10         MR. FLOOD:  No, Judge, I think -- I think that was

11    an address of service which is what they're relying on in the

12    UAE.

13         THE COURT:  Okay.  Okay.

14         MR. FLOOD:  That was never represented to be his

15    home, his residence.

16         THE COURT:  Fair enough.  All right.

17         MR. ALUM:  In any event, Judge, the -- Mr. Van Heur

18    has extensive ties abroad, he's traveled to Mexico, he's

19    traveled to Spain.  He has a passport, he has no known ties to

20    the Southern District of Texas, no known ties to the United

21    States.

22         THE COURT:  All right.  I get it.

23         MR. ALUM:  So what --

24         THE COURT:  I got it.

25         Okay.  Argument?

53

1            MR. FLOOD:  Well, the only argument I would make,

2      Your Honor, is he -- yeah, I mean he was extradited here from

3      Spain, they brought him in, obviously he doesn't have status

4      in the United States, but that's an immigration matter that --

5      it's my understanding there's an immigration detainer on him,

6      and that will be addressed by the Immigration Court, if

7      necessary.

8            THE COURT:  I don't think there'll be an Immigration

9      Court, I think he'll just get sent right back from whence he

10     came with nothing in between.  It's an extradition.  He's

11     not -- he's not sitting here trying to say, I want to stay in

12     the United States, or I've got some claim to be in the United

13     States, or he didn't like walk across the border and claim

14     asylum, there's none of that.  He was extradited.  And when

15     they're done with him, whether it be guilty or not guilty,

16     he's going back to the Netherlands.

17           MR. FLOOD:  But, Your Honor, they won't --

18           THE COURT:  It won't be a court hearing as far as I

19     understand.

20           MR. FLOOD:  Well, they would have --

21           THE COURT:  I mean unless he tries to make some

22     claim.

23           MR. FLOOD:  Right, unless -- well --

24           THE COURT:  Yeah.

25           MR. FLOOD:   -- except that he would be bound to

1    appear in the United States.  I mean this Court could enter --

2          THE COURT:  Well, I understand.  I understand.  I'm

3    just saying when all of that's done there won't be anything to

4    deal with.  When they are done with him, they'll return him

5    from whence he came.  That's all -- that's all I'm saying.

6          MR. FLOOD:  He could be released on bond and then

7    have that matter pending along with this pending matter,

8    that's all we're asking, Your Honor.

9          THE COURT:  Well, I don't -- okay.  I understand.

10    I'm not -- okay.  Is that all -- is that it?

11          MR. FLOOD:  Well, the only other thing I would say,

12    Your Honor, is he has no criminal history, his wife is able to

13    come here and establish ties to the community.  If the Court

14    needs a surety, I can understand that in this situation.  But

15    we can satisfy through conditions with monitors and things

16    like that the alleged flight risk issue, especially on the

17    fact that he -- if he's out at all, he can be on immigration

18    bond as well.

19          THE COURT:  All right.  Thank you.

20          MR. FLOOD:  Thank you, Your Honor.

21          THE COURT:  The long and short of it is that he

22    checks every single box for detention is the problem.  He's

23    got foreign ties, no ties -- just you can --

24          MR. FLOOD:  Okay.

25          THE COURT:   -- just you can do what you need to do

1      in a minute, let me --

2                UNIDENTIFIED SPEAKER:  Go ahead.

3                THE COURT:   -- make my ruling.  He has no ties to

4      this country, he has only ties to foreign countries.  He

5      has -- and the immigration thing matters only because he has

6      no status to work here.  He has no status to do anything here.

7      He has -- you're proposing that he import his wife to the

8      United States to establish a tie.  That's not a tie.

9      That's -- that's just not a tie.  I won't find that it is.

10               There's -- maybe it's not a heavily weighted factor

11     because he does have the right to contest his extradition,

12     which people do routinely as you and I well know.  But, you

13     know, the fact that he, you know, spent something like 10

14     months not wanting to come here to face these charges is at

15     least indicative of exactly that, not wanting to face the

16     charges.

17               I can't find any -- I can't find anything in favor

18     of release on bail.  And, no, I'm not -- forget the UAE thing,

19     I'm just taking that out of my mind, I don't know anything

20     about it.  Forget the 2007 thing, I don't know what that is.

21     I do know that things go fast and sometimes the questions

22     aren't clear and there might have been, you know, some kind of

23     communication breakdown.

24               But the things that I know to be true are that he's

25     something of a world traveler, he does have access to money,

1     it is a complicated fraud scheme involving faked up documents

2     in one sense or another.  I fully appreciate that you may have

3     a defense to this, but there's just -- I just -- I cannot find

4     by a preponderance of the evidence that there are -- well, I

5     do find by a preponderance of the evidence that there are no

6     conditions I could set that would assure his appearance.

7              Now if you had something you wanted to tell me, now

8     is the time to tell me.

9              MR. FLOOD:  No, Your Honor, I don't have --

10             THE COURT:  I interrupted you, I'm just saying --

11             MR. FLOOD:  No, no, no.

12             THE COURT:   -- now's your chance.

13             MR. FLOOD:  No further proffer of evidence or

14    argument.

15             THE COURT:  All right.  So that's my ruling.  And

16    does he -- I can't remember now, it's been a long time, did we

17    arraign him at the beginning?

18             MR. ALUM:  We did.

19             MR. FLOOD:  We did.

20             THE COURT:  We did.  All right.  So then with that

21    everyone's excused on this case.

22             MR. ALUM:  Thank you, Your Honor.

23             THE COURT:  All right.

24         (Hearing adjourned 2:07 p.m.)

25                         *  *  *  *  *

1            *I certify that the foregoing is a correct transcript*

2       *to the best of my ability produced from the electronic sound*

3       *recording of the proceedings in the above-entitled matter.*

4         */S./  MARY D. HENRY*

5       *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6       *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

7       *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8       *JTT TRANSCRIPT #69577*

9       *DATE FILED:  FEBRUARY 4, 2025*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25